Gluck v Kamin Health Williamsburg, LLC (2025 NY Slip Op 50548(U))

[*1]

Gluck v Kamin Health Williamsburg, LLC

2025 NY Slip Op 50548(U)

Decided on April 16, 2025

Supreme Court, Kings County

Mallafre Melendez, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 16, 2025
Supreme Court, Kings County

Solomon Gluck, as Administrator of the Estate of DEVORA GLUCK, 
 Deceased, and SOLOMON GLUCK, Individually, Plaintiff,

against
Kamin Health Williamsburg, LLC, UNION MEDICAL CARE, PLLC, UC MANAGEMENT LLC, ARTHUR KORNBLIT, M.D., 
 ANTONIO KING, PAC and CHAIM ADLER, P.A., Defendants.

Index No. 509381/2021

Plaintiff
Scott Howard Seskin, Esq. (ss@seskinlaw.com)
Seskin & Seskin
18 East 41st Street, Suite 800
New York, NY 10017
212-751-0077
Defendant Kamin Health Williamsburg, LLC, Union Medical Care, PLLC, UC Management LLC, Antonio King PAC, and Chaim Adler, PA
Eric S. Stober, Esq. (eric.strober@rivkin.com)
Rivkin Radler LLP
477 Madison Avenue, Suite 410New York, NY 10022
212-455-9555
Defendant Arthur Kornblit, M.D.
Bora Seo, Esq. (bseo@omcdoc.com)
O'Connor McGuinness Conte Doyle Oleson Watson & Lotfus, LLP
One Barker Avenue, Suite 675
White Plains, NY 10601
914-948-4500

Consuelo Mallafre Melendez, J.

Recitation, as required by CPLR §2219 [a], of the papers considered in the review:
NYSCEF#s: Seq. 2: 40 — 42, 43 — 52, 61, 62 — 70, 81
Seq. 3: 53 — 55, 56 — 57, 71, 72 — 80, 82
Defendant Arthur Kornblit, M.D. ("Dr. Kornblit") moves (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor and dismissing all causes of action against him.
Defendants Kamin Health Williamsburg, LLC, Union Medical Care, PLLC, UC Management LLC, Antonio King, PAC ("PA King"), and Chaim Adler, PA ("PA Adler") separately move (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint in its entirety.
Plaintiff opposes both motions.
Plaintiff commenced this action on April 21, 2021, on behalf of Decedent's estate, asserting claims of medical malpractice and wrongful death. Plaintiff also asserts individual claims for loss of services. The claims arise from care and treatment rendered on April 25, 2019, when Decedent presented at Kamin Health Urgent Care.
On April 25, 2019, approximately 4:30 p.m., Decedent presented to Kamin Health Urgent Care with "shortness of breath and pressure on chest." She was seen by PA King, who performed a physical examination and ordered an EKG. PA King assessed her with tachycardia and non-specific EKG findings, and she was discharged with instructions to go to an emergency room if certain signs and symptoms appeared or worsened. He noted: "Pt was advised to go the emergency room tonight but due to holiday the patient refused as she felt symptoms were not worsening. No medications prescribed as pharmacy closed tonight and EKG was non-specific. Pt advised to go to emergency room if chest pressure worsen or sob [shortness of breath] worsen, dizziness, leg pain, worsening headaches or chest pain radiating to arm or shoulder."
Shortly after midnight on April 27, 2019, Decedent had difficulty breathing and an ambulance was called to her home. She arrived at non-party New York Presbyterian in cardio-pulmonary distress, and an CT scan revealed a pulmonary embolism. She then went into cardiac arrest. Despite advanced life support and resuscitation efforts, she was pronounced dead at 5:02 a.m.
Plaintiff alleges that PA King departed from the standard of care by failing to appreciate Decedent's abnormal EKG findings and appropriately refer her to the hospital for immediate treatment on April 25. Plaintiff also asserts vicarious liability claims against the other defendants, including the urgent care's medical director Dr. Kornblit and supervising physician's assistant PA Adler. Plaintiff further alleges that these departures proximately caused the worsening of Decedent's pulmonary embolism and her death.
As an initial matter, both motions from the defendants rely heavily on testimony from PA King regarding his conversation and interaction with Decedent. They contend based on his testimony, as well as the Kamin Health Urgent Care medical records, that PA King appropriately conveyed the severity of Decedent's symptoms and that she "emphatically" declined to go to the hospital. In opposition, Plaintiff argues this evidence is barred by the "Dead Man's Statute" and cannot support a motion for summary judgment.
Generally, CPLR 4519 (commonly known as the Dead Man's Statute) prohibits a party from offering testimony in their own interest as to their "personal transaction or communication" with a deceased person, on the principle that the deceased would be unable to refute their claims. [*2]Personal communication includes "every method by which one person can derive any impression or information from the conduct, condition or language of another" (Holcomb v Holcomb, 95 NY 316 [1884]). "Emphatically, evidence excludable under the Dead Man's Statute should not be used to support summary judgment" (Phillips v Kantor & Co., 31 NY2d 307, 313 [1972]), and "evidence that would be inadmissible at trial under the Dead Man's Statute may not be relied upon to establish prima facie entitlement to judgment as a matter of law" (Weber v Sharma, 232 AD3d 930, 932 [2d Dept 2024]).
The statute is applied less stringently when considering opposition to a motion for summary judgment, because as the Court of Appeals noted, complex rules of evidence and their exceptions are best litigated at trial, and a summary judgment motion is most concerned with "whether an issue of fact exists, without being overly concerned with how the parties will or may prevail on that issue" (Phillips, at 315). Still, the Second Department has held that testimony barred by the Dead Man's Statute can be excluded even in opposition to summary judgment, when it is the only evidence offered and there is no doubt it would be excluded at trial (Stathis v Estate of Karas, 193 AD3d 897, 900-901 [2d Dept 2021]).
In a medical malpractice context, the Second Department recently dealt with the issue of applying the Dead Man's Statute to depositions and medical records. The appellate court found that the deposition and affidavits of two defendant physicians "largely based on their communications with the decedent could not be considered as evidence in support of the defendants' motion for summary judgment" (Weber, at 932). However, the deposition of a non-party nurse was admissible because the nurse was not an "interested party," and "the medical records were admissible as pertinent to the diagnosis and treatment of the decedent" (Id.) To the extent that the medical records are consistent with barred testimony, those records may be considered to provide "sufficient, independent support for the expert opinions" even if the depositions are excluded (Butler v Cayuga Med. Ctr., 158 AD3d 868, 873 [3d Dept 2018]).
Given the clear similarities between this case and Weber, this Court is bound to follow the appellate court's application of the Dead Man's Statute. The deposition of PA King, with respect to his personal interactions with Decedent, cannot be considered in support of the defendants' motions for summary judgment. However, his contemporaneous medical records do not fall under the scope of the Dead Man's Statute, and they are otherwise admissible as exceptions of the hearsay rule, so the court may consider these records. The Court will disregard any portions of the movants' expert affirmations based on PA King's testimony of his conversations with Decedent, where it is not independently corroborated by the records.
This Court may consider PA King's testimony as to his interactions with Decedent to the extent it is cited by Plaintiff in opposition to this motion, because it is not the "sole evidence proffered by the opposing side," and the court's primary concern at this stage is determining whether an issue of fact exists (Phillips, at 315; Stathis, at 900).
In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure" (Rosenzweig v Hadpawat, 229 AD3d 650, 652 [2d Dept 2024]). "In order to sustain this prima facie burden, the defendant must address and rebut any specific allegations of malpractice set forth in the plaintiff's complaint and bill of particulars" (Martinez v Orange Regional Med. Ctr., 203 AD3d 910, 912 [2d Dept 2022]). "A defendant's failure to satisfy this prima facie burden requires [*3]denial of the motion, regardless of the sufficiency of the opposing papers" (Ciceron v Gulmatico, 220 AD3d 732, 734 [2d Dept 2023]). "Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (Rosenzweig, at 652 [2d Dept 2024] [internal quotation marks and citations omitted].) However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact" (Barnaman v Bishop Hucles Episcopal Nursing Home, 213 AD3d 896, 898-899 [2d Dept 2023]).
The primary issue before this Court is whether PA King departed from the standard of care, and whether said departures proximately caused Decedent's claimed injuries and death. PA King was the physician's assistant who provided direct care to Decedent on April 25, 2019, and the other defendants are alleged to be vicariously liable for his actions.
In support of the motion (Seq. No. 2) on behalf of medical director Dr. Kornblit, the movant submits an expert affirmation from Joel M. Bartfield, M.D. ("Dr. Bartfield"), a licensed physician board certified in internal medicine and emergency medicine, who sets forth his qualifications to opine on the standard of care for treating patients in an urgent care setting.
In support of their separate motion (Seq. No. 3), PA King, PA Adler, and the Kamin Health Urgent Care defendants incorporate the facts and opinions set forth in Dr. Bartfield's expert affirmation. As such, the motions will be considered together with respect to PA King's liability.
Dr. Bartfield opines that Decedent was treated in accordance with the standard of care for an urgent care provider whose diagnostic tools and specialists are limited. He states that an urgent care facility cannot perform certain diagnostic tests including "blood tests, duplex scans, CTs, CTAs, MRIs" and therefore is "not equipped to definitively rule out" pulmonary embolism. He opines that "it is the standard of care for providers in such facilities to refer their patients to emergency rooms or hospitals" when a pulmonary embolism is possible. In his opinion, PA King fulfilled this standard of care by performing a physical examination, EKG, and recommending Decedent visit an emergency room for further workup.
Dr. Bartfield notes that according to the medical records, Decedent presented with some possible symptoms of pulmonary embolism — shortness of breath and chest pressure — but she did not exhibit coughing, wheezing, dizziness, or fever. She also did not exhibit any "classic symptoms" of deep vein thrombosis such as leg edema, and her vital signs were normal apart from a "slight elevation" in heart rate. Therefore, he opines that "her clinical picture did not require calling 911 or an ambulance on April 25, 2019." However, he opines that she was "appropriately recommended" to visit an emergency room because there was "a possibility of an underlying pulmonary and/or cardiology condition requiring further workup" in a hospital setting.
On the issue of proximate causation, Dr. Bartfield argues that no departures from the standard of care caused or contributed to Decedent's untreated pulmonary embolism or death, because it was the patient who allegedly "refused" PA King's medical advice and referral to a hospital emergency room.
Dr. Kornblit also submits an expert affirmation from Lawrence W. Solomon, M.D. ("Dr. Solomon"), a licensed physician board certified in cardiovascular disease, echocardiography, and nuclear cardiology. PA King and the other defendants incorporate the opinions of Dr. Solomon [*4]in support of their motion.
Dr. Solomon opines that PA King acted in accordance with the standard of care on April 25, 2019, when he performed a physical examination and EKG in response to her shortness of breath, chest pressure, and mildly elevated heart rate.
Dr. Solomon notes that a pulmonary embolism may or may not be detected by an EKG ("most commonly causing sinus tachycardia and/or nonspecific ST/T wave changes"). He opines that "more advanced tools" are required to definitively diagnose or rule out a pulmonary embolism, such as CT angiography, Doppler ultrasound, VQ nuclear imaging, invasive angiography, or D-Dimer tests. Because none of these tests can be provided at an urgent care, Dr. Solomon states that Decedent was "correctly referred to a hospital on the evening of April 25, 2019 for urgent evaluation." He further opines that in the case of a patient's "refusal" to immediately visit an emergency room, it was proper for PA King to discharge her with instructions to visit an emergency room if new or worsened symptoms appeared or call 911 if she had signs of a heart attack.
Dr. Solomon notes, as indicated in the medical records, Decedent's lungs were clear with no rales, rhonchi, or wheezes on examination, she was "not in acute distress," and she had no sign of deep vein thrombosis in her extremities. She also reported no "major events," only a history of migraines and acid reflux. As such, Dr. Solomon opines that her presentation "did not necessitate calling an ambulance." He also opines that it was appropriate for PA King to prescribe no medication, because "no patients should be provided with medications without first ascertaining their underlying condition."
Based on the Court's review of these submissions, the movants' experts have not met their prima facie burden of establishing PA King complied with the standard of care. Notably, the experts opine that he performed appropriate tests (physical examination and EKG) for an urgent care facility, but they acknowledge that definitive testing to rule out a pulmonary embolism or other life-threatening cardiac event would only be available in a hospital. The experts are therefore equivocal on whether the standard of care was met, since additional tests and consultations only available at hospitals were "necessary" in the words of both experts.
Additionally, the experts are equivocal on the standard of care for recommending or transporting her to a facility where she could receive such tests. The experts contradictorily opine that her symptoms did not warrant calling an ambulance for transport to a hospital, but also opine that PA King appropriately advised her to seek "immediate evaluation in the emergency department" and "advised the patient to go directly to an ER for further exploration." Dr. Bartfield acknowledges that Decedent had symptoms suspicious for pulmonary embolism and states that the standard of care required referral to a hospital emergency room for "urgent evaluation," but concludes PA King complied with this standard when he "advised" her to go to an emergency room, and then "in light of her strong refusal . . . advised her to visit an ER if her chest pressure or shortness of breath worsened."
In focusing on the patient's alleged refusal to proceed to a hospital, the movants' expert opinions are conclusory and fail to address whether PA King recognized and conveyed the severity of Decedent's symptoms or the need for immediate evaluation. Dr. Bartfield states without evidence that PA King "urged her to go directly to an ER . . . because he believed that her presenting symptoms could be an emergency," and that "it was the patient who insistently refused to visit a hospital that evening." This is not substantiated by the medical chart, which states that she was "not in acute distress at this time," she was "advised to go to the emergency [*5]room tonight but due to holiday the patient refused as she felt symptoms were not worsening," and she was discharged with instructions to go to the emergency room only if specific heart attack symptoms manifested or worsened.
Similarly, Dr. Solomon states without evidentiary support that Decedent was fully informed that the "necessary tools and equipment to further evaluate her potentially dangerous presenting symptoms were available at hospitals, but the patient refused." Again, there is nothing in the chart indicating that she was informed of any potentially dangerous condition or necessary tests or treatment which she declined, so the expert's opinion is conclusory and speculative.
In a recent Second Department case, highly similar to the facts here, an urgent care defendant argued that their providers had informed the patient "he was suffering from cellulitis, a life-threatening condition that could lead to sepsis, and that he needed to be hospitalized, but that the decedent refused to go to the hospital." However, the medical records made no mention of the risk of sepsis or death, only stated that the patient was advised he "would be best served being evaluated in the hospital but he refuses that," and he was therefore discharged with alternate follow-up instructions. (Glassman v Caremount Med., P.C., 226 AD3d 878, 879-880 [2d Dept 2024].) The Appellate Division held the trial court should not have granted summary judgment, because "the defendants' evidentiary submissions failed to eliminate triable issues of fact regarding the information and degree of urgency relayed by [the urgent care provider] to the decedent" (id., at 880). In another similar case, the medical records stated the patient "declined transfer to the ER for troponin testing," but the appellate court found this was insufficient to establish prima facie the patient was fully advised of the risks of her heart condition, as "the records did not indicate that [the physician] specifically counseled the decedent as to a potentially serious medical crisis requiring immediate hospital monitoring and treatment" (Weber, at 933).
In this case, the urgent care records state that PA King "advised [Decedent] to go to the emergency room tonight," but then advised her to go only if her symptoms worsened and discharged her with the latter instructions. As in Glassman and Weber, there is no evidence in the medical record that Decedent was informed she was potentially suffering a life-threatening cardiac event, nor any indication she would "insistently" refuse treatment even if an ambulance had been called. For the same reasons expressed by the Second Department, this Court finds there are triable issues of fact as to the information and advice given to Decedent, and therefore insufficient basis for the experts' opinions that PA King appropriately referred her for "immediate" or "urgent" evaluation at a hospital.
The movants' argument on proximate causation also fails. The experts render opinions which are speculative and not probative on the issue of whether Decedent's pulmonary embolism, cardiac arrest, and death were proximately caused by PA King's alleged departures from the standard of care. Instead, the movants place the onus on the patient who allegedly refused to comply with medical advice, despite questions of fact as to what information she was given on the urgency of receiving additional tests and the possibility of a fatal condition. The defendants' cardiovascular expert Dr. Solomon asserts that Decedent was so emphatic or insistent on not going to a hospital that evening that "an ambulance would have been pointless." This is pure speculation, not supported by the record, and does not establish a lack of proximate causation. The movants cannot establish as a matter of law that Decedent "would have rejected appropriate warnings and advice" if different information had been provided to her (Romanelli v Jones, 179 AD3d 851, 856 [2d Dept 2020]), nor how she would have responded if an ambulance [*6]was called. "Whether the decedent would have heeded appropriate warnings and advice . . . is for the jury to decide" (id., at 857). Accordingly, the Court finds the movants have not established prima facie entitlement to summary judgment on PA King's liability or proximate causation as a matter of law.
Notwithstanding the movants failure to meet their prima facie burden, Plaintiff submits an expert affirmation from David Barlas, M.D. ("Dr. Barlas"), a licensed physician board certified in emergency medicine, in opposition to the motions.
First, Dr. Barlas opines that PA King departed from the standard of care in his review of Decedent's EKG. PA King documented that the EKG showed tachycardia and was otherwise "non-specific" with no "acute changes," which would indicate immediate hospitalization was not necessary. However, Dr. Barlas opines that the EKG "demonstrated abnormal ST and T waves," which combined with her symptoms of shortness of breath, chest pressure, and tachycardia, suggested "a significant cardio-pulmonary illness and event," such as pulmonary embolism or myocardial infarction. He opines either of these conditions "require immediate hospitalization, testing and treatment," as they are life-threatening and have a greater chance of survival if treated promptly. Thus, he opines that PA King failed to recognize the severity of Decedent's symptoms and EKG results, and he counters the movants' experts that she did not require immediate transport to the hospital by ambulance.
Further, he notes that "although [PA King] allegedly advised the decedent to go to the emergency room," there is nothing in the record demonstrating that he conveyed to her she may be suffering a pulmonary embolism or heart attack which could be fatal if not treated. There is no evidence she was presented with or signed the urgent care's Against Medical Advice ("AMA") form, which affirmatively states the patient is declining transport to a hospital despite "a medical problem which requires medical attention," and the patient is aware death, disability, and/or other potential consequences may result from refusing this advice. Dr. Barlas opines that PA King departed from good and accepted medical practice by failing to inform Decedent "that there was a high probability that she was suffering from a myocardial infarction or pulmonary embolism, and that she could die if she [did] not go to the hospital immediately for further treatment and testing." In the expert's opinion, even if the patient allegedly "refused" to go to the emergency room that night, it is the standard of care to provide an AMA or similar document to ensure the patient understands there is "a significant threat to life and limb if they do not follow medical advice," and to ensure "the medical practitioner has fully explained" that risk to the patient, as the patient lacks the medical knowledge of the provider and may not comprehend the seriousness of their condition.
Additionally, Dr. Barlas agrees with the movants' experts that aspirin or other medications should not have been prescribed without further diagnosis, and they would not have aided her underlying condition. However, he notes that the medical record states she was not prescribed medication because the pharmacy was closed, and PA King testified that he otherwise may have prescribed "something to help with the shortness of breath," or aspirin for a potential "cardiac event." The expert opines this further demonstrates PA King did not appreciate her medically unstable condition.
On the issue of proximate causation, Dr. Barlas opines that based on the EKG abnormalities, Decedent's pulmonary embolism was already present and developing at the time of her urgent care visit. He opines that with a pulmonary embolism, "the quicker the treatment, the better the chance for a positive outcome," and that being referred and/or transported by [*7]ambulance to a hospital for definitive diagnosis and treatment on April 25 would most likely have prevented Decedent's worsened condition and death.
Plaintiff also submits an expert affirmation from Bruce M. Decter, M.D. ("Dr. Decter"), a licensed physician board certified in cardiovascular disease and nuclear cardiology.
Dr. Decter opines that Decedent's EKG revealed "sinus tachycardia and inverted T waves in the right precordial leads," which represents a "clear abnormality" for a patient in her 40s. Combined with her symptoms of shortness of breath and chest pressure, he opines that a pulmonary embolism should have been considered as part of a differential diagnosis. He opines that PA King departed from the standard of care in his assessment that she only had a slight elevated heart rate, "no acute changes," and that he "did not see any evidence of a cardiac event."
Dr. Decter opines that in light of the limited diagnostic tools available from an urgent care, the standard of care required immediate transport to a hospital to rule out or diagnose her cardiovascular condition, using such tests as troponin, D-Dimer, and radiological studies "which could only be done in a hospital setting, on an immediate basis."
Dr. Decter opines that PA King departed from the standard of care by failing to recognize and inform Decedent that she could be suffering from a pulmonary embolism or other potentially fatal condition that required emergency medical treatment from a hospital. Like the Plaintiff's other expert, Dr. Decter opines that if Decedent was resistant to go to an emergency room the same day, PA King should have called an ambulance and/or presented her with an AMA form to ensure she was aware of the seriousness of her condition. Instead, Dr. Decter notes that nothing in the medical chart indicates he conveyed the possible life-threatening condition to her, only that she "refused" advice to go to an emergency room on a holiday "as she felt symptoms were not worsening," and PA King advised her to go if she did experience worsening symptoms.
On proximate causation, Dr. Decter opines that at the time of the EKG on April 25, Decedent was suffering from "micro emboli," which without treatment progressed and caused her death less than two days later. He opines that if her EKG and symptoms were properly assessed at the urgent care, and she was properly informed of the immediate need to proceed to a hospital for a potential life-threatening condition, she would have received a cardiovascular workup which would have identified and treated her pulmonary embolism. Thus, he opines that PA King's departures from the standard of care substantially contributed to a delay in proper diagnosis/treatment and to her death.
Even if the defendants had established prima facie entitlement to summary judgment, Plaintiff's submissions raise clear issues of fact on the alleged departures from the standard of care by PA King. The experts offer a conflicting opinion on PA King's interpretation of the EKG, which Plaintiff asserts showed abnormal ST and T wave changes where PA King noted only "non-specific" tachycardia. Plaintiff's experts opine these EKG results required further, urgent testing in a hospital setting.
Plaintiff also raises issues of fact as to the sufficiency of PA King's instructions or advice to go to the emergency room that evening, and his alleged failure to call an ambulance. Based on Decedent's EKG results and symptoms, Plaintiff's experts opine that the standard of care required calling an ambulance or providing the patient with an AMA form conveying the risk to her life and health by declining transport to a hospital. In reply, the movants argue that it is speculative to assume signing an AMA form would have changed her decision and her outcome. However, it is not Plaintiff's burden in opposing a motion for summary judgment to prove their [*8]case, only to demonstrate issues of fact. Ultimately, whether PA King failed to appropriately warn Decedent of a potentially life-threatening ailment that required immediate medical attention, and whether Decedent would have heeded such warnings, are issues for the jury to determine.
The Court notes that a separate cause of action for lack of informed consent is not asserted in Plaintiff's Complaint, and it is not applicable to cases involving failure to diagnose/treat, because such a claim requires an "affirmative violation of physical integrity" (see S.W. v. Catskill Regional Med. Ctr., 211 AD3d 890, 891 [2d Dept. 2022]; Public Health Law § 2805-d [2]). However, this is not to be conflated with the allegation that the defendants failed to properly inform Decedent of the risks of leaving/declining hospital evaluation, which is a viable part of Plaintiff's medical malpractice and wrongful death claims.
In sum, the movants have failed to eliminate issues of fact on PA King's alleged departures from the standard of care, and thus the motion on his behalf is denied.
On the issue of vicarious liability, Dr. Kornblit does not dispute that he was the medical director at Kamin Health Urgent Care and that he had a supervisory role over PA King and other physician's assistants. In a personal affidavit, Dr. Kornblit averred that he did not have any involvement in Decedent's evaluation and care on April 25, 2019, although he was available to be called by PA King "if a consultation was required." He states that he was not called for consultation on that date, but that he reviewed the chart and found PA King's treatment "proper," and he would have "reached the identical decision" had he been consulted.
Dr. Kornblit has not eliminated issues of fact as to his supervisory obligations or vicarious liability for the acts and omissions of PA King. He also does not address any claims of direct liability in the bill of particulars, such as failing to properly supervise and manage physician's assistants providing patient care, e.g., by not reviewing results of an EKG. Thus, Dr. Kornblit has not established prima facie entitlement to summary judgment on any direct claims against him, nor on vicarious liability for alleged acts and omissions of PA King.
Similarly, it is uncontested that at the time of the events, Kamin Health Urgent Care was "owned and operated" by the entities sued herein as Kamin Health Williamsburg, LLC, Union Medical Care, PLLC, and UC Management LLC. It is also not contested by the movants that defendant PA Adler was a "supervising physician's assistant." The movants do not make any argument on the vicarious liability of Kamin Health Williamsburg, LLC, Union Medical Care, PLLC, UC Management LLC, or PA Adler for the alleged acts and omissions of PA King. Their sole contention is that PA King complied with the standard of care, and therefore "all defendants who are alleged to be liable to the plaintiff for the care provided by Mr. King are entitled to summary judgment." As such, the issue of vicarious liability for PA King is not before the Court on this motion, and summary judgment on behalf of all the defendants is denied.
Accordingly, it is hereby:
ORDERED that Dr. Kornblit's motion (Seq. No. 2) for an Order, pursuant to CPLR 3212, granting summary judgment in his favor and dismissing all causes of action against him, is DENIED; and it is further
ORDERED that Kamin Health Williamsburg, LLC, Union Medical Care, PLLC, UC Management LLC, PA King, and PA Adler's motion (Seq. No. 3) for an Order, pursuant to CPLR 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint in its entirety, is DENIED.
This constitutes the decision and order of this Court.
ENTER.
Hon. Consuelo Mallafre Melendez J.S.C.